*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re A. A. BARNES, JR., Minor.

UNPUBLISHED
August 18, 2022

No. 359876
Cass Circuit Court
Family Division
LC No. 18-000111-NA

Before: SAWYER, P.J., and SHAPIRO and REDFORD, JJ.

PER CURIAM.

Respondent-father appeals by right the trial court's order terminating his parental rights to his child, AB, under MCL 712A.19b(3)(j). In the trial court, the Department of Health and Human Services took the position that the child should be reunified with respondent even though there was evidence that respondent's poor choices had contributed to a long history of his older children being involved with Children's Protective Services (CPS). Eventually, the child's lawyer-guardian ad litem (L-GAL) petitioned the trial court to terminate respondent's parental rights. After a four-day evidentiary hearing, the trial court found that the L-GAL had established grounds for termination by clear and convincing evidence and that termination was in the child's best interests. On appeal, respondent argues that the L-GAL breached his statutory duties and the trial court clearly erred when it found that the L-GAL had met his burden of proof. For the reasons explained in this opinion, we affirm.

## I. L-GAL DUTIES

Respondent first argues that the L-GAL breached his duties to the child in several respects. He argues that these breaches prejudiced his termination hearing.[1]

---

[1] This Court reviews de novo the proper interpretation and application of statutes. See *In re Gonzales/Martinez*, 310 Mich App 426, 431; 871 NW2d 868 (2015). As respondent concedes on appeal, he did not challenge the L-GAL's acts or omissions in the trial court. Therefore, he has not preserved this claim of error for appellate review, and our review is limited to plain error affecting substantial rights. See *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008).

-1-

The L-GAL owed several statutory duties to the child. He did not, however, owe any duty to respondent, to the Department, or even to the trial court. See MCL 712A.17d(1). For that reason, respondent has no standing to challenge whether L-GAL's representation met the minimum standards of professional representation. See *In re HRC*, 286 Mich App 444, 458; 781 NW2d 105 (2009). In any event, he has not established that the L-GAL violated any of his statutory duties.

Respondent first argues that the L-GAL violated his duty to meet the child in person, and, more specifically, to observe respondent interact with the child. MCL 712A.17d(1)(d) requires the L-GAL to meet with the child before specified hearings to assess the child's "needs and wishes." But the statute does not require the L-GAL to observe the child's parenting-time interactions or to meet with the child's siblings. See MCL 712A.17d(1)(d). As such, respondent's complaints about the L-GAL's failure to observe the parenting-time visits or to meet with AB's older half-sibling, D, are not well taken.

The record does show that the L-GAL did not personally meet with the child, which could amount to a violation of the duty to meet under MCL 712A.17d(1)(d). It is, however, evident from the record that the L-GAL kept informed about the child's progress and situation, and was aware of his needs. Moreover, there were extenuating circumstances that made it impractical for the L-GAL to meet with the child in person before the specified hearings. For example, the foster family lived quite a distance from the L-GAL, the child was too young to communicate with the L-GAL about his needs and wishes for a substantial period of time, and the pandemic occurred during the events at issue. Under the circumstances, the trial court might have authorized the L-GAL to contact the child through alternate means, had respondent raised the issue in the trial court. See MCL 712A.17d(1)(e). The fact that the trial court specifically determined that L-GAL met his obligations after several hearings, further supported an inference that the trial court was aware of the issue and did not conclude that the L-GAL's failure to meet with the child amounted to a violation of his duties to the child. Consequently, on the record before this Court, respondent has not shown that the L-GAL's failure to meet with the child in person amounted to plain error.

Respondent next maintains that the L-GAL failed to promote the cooperative resolution of the dispute, as required under MCL 712A.17d(1)(k). However, this provision states that the L-GAL must make an effort to promote the cooperative resolution of the dispute consistent with the rules of professional responsibility. See MCL 712A.17d(1)(k). As already discussed, the L-GAL owed his duty to the child and had to act consistent with the child's best interests. Once the L-GAL determined that it was in the child's best interests to seek the termination of respondent's parental rights, he could not compromise the child's best interests in order to promote cooperation with respondent or the Department. See MCL 712A.17d(1)(i) (stating that the L-GAL must advocate for the child's best interests according to his or her understanding of those interests). The trial court did not plainly err when it allowed the L-GAL to take a position that was adversarial to those of respondent and the Department.

---

"Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Id*. at 9.

-2-

Respondent also complains generally that the L-GAL acted improperly by investigating respondent and taking an adversarial position against him, but those actions were not improper. The L-GAL had a duty to investigate the evidence and form an opinion about the child's best interests. See MCL 712A.17d(1)(c) (stating that an L-GAL has a duty to "determine the facts of the case by conducting an independent investigation including, but not limited to, interviewing the child, social workers, family members, and others as necessary, and reviewing relevant reports and other information"). The evidence adduced at the hearings after the adjudication suggested that the Department was not verifying respondent's self-reported history and was not investigating whether respondent or his other children had a history of involvement with CPS that implicated respondent's ability to parent the child safely. Under those circumstances, the L-GAL could reasonably seek to gather evidence on his own in order to ensure that he had the evidence from which to make a responsible determination about the child's best interests. See MCL 712A.17d(1)(c); MCL 712A.17d(1)(i). To be sure, the L-GAL sometimes used strong language—such as referring to respondent as a pathological liar and stating that the Department was giving him a free pass on his marijuana use—when advocating for the child, but respondent has not argued or shown that the L-GAL's comments could have prejudiced the termination hearing.

Finally, respondent also suggests that the L-GAL's decision to petition the trial court was itself evidence that he was acting inappropriately. An L-GAL is a guardian under Michigan law, see *Farris v McKaig*, 324 Mich App 349, 356; 920 NW2d 377 (2018), and so has the authority to file a petition to terminate a parent's parental rights, see MCL 712A.19b(1). As this Court has stated, an L-GAL is not simply one who helps the trial court determine the child's best interests; he or she is a full and active participant in the litigation who serves as the advocate for the child's best interests. See *Farris*, 324 Mich App at 359. Once the L-GAL determined that it was in the child's best interests to terminate respondent's parental rights, he had a duty to file the petition if the Department refused to do so. See MCL 712A.17d(1)(b) (stating that the L-GAL has a duty to "serve as the independent representative for the child's best interests" and, to that end, has the right to "full and active participation in all aspects of the litigation"). Additionally, the trial court practically invited the L-GAL to file the petition because the Department obviously was not going to do so and the court worried that the protracted litigation was harming the child. Under those circumstances, the L-GAL's decision to file the petition cannot serve as a basis for questioning his professionalism.

Respondent has not shown that the L-GAL violated any statutory duties. But even if he had established some breach of duty, he would not be entitled to any relief. Respondent has not explained how any of the L-GAL's acts or omissions prejudiced the outcome of the lower court proceedings. The trial court was presumed to be aware of the law and to know the difference between proper and improper statements by the lawyers. See *People v Wofford*, 196 Mich App 275, 282; 492 NW2d 747 (1992). For that reason, even if the L-GAL could be said to have violated a statutory duty or made intemperate remarks, those violations presumably did not prejudice respondent's hearing. See *id*. Therefore, respondent has not established plain error that warrants relief. See *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008).

## II. TERMINATION

Respondent also argues that the L-GAL failed to establish a ground for termination and failed to show that termination was in the child's best interests.[2]

A trial court may terminate a parent's parental rights to a child if it finds by clear and convincing evidence that the petitioner established one or more grounds for termination. See MCL 712A.19b(3). In this case, the trial court found that the L-GAL had established grounds for terminating respondent's parental rights under MCL 712A.19b(3)(j). That statute provides that termination is appropriate when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." MCL 712A.19b(3)(j).

In making its findings, the trial court focused on the evidence that respondent had been diagnosed with personality traits that made it less likely that he would protect the child from harm. Specifically, the trial court cited Dr. Randall Haugen's testimony and psychological assessment of respondent.

At trial, Dr. Haugen testified that respondent, who was then 52 years of age, tended to minimize or deny that he had problems that most people would endorse. Respondent's scores were consistent with taking a "defensive response approach" and making an effort to create a favorable impression on others—to present as a responsible and conscientious person. Dr. Haugen diagnosed him with narcissistic tendencies as well.

Dr. Haugen related that respondent's test results were consistent with his reported history of having himself been the victim of abuse and neglect as a child. He explained that children exposed to such trauma frequently protect themselves by a reluctance to admit problems or vulnerabilities. They self-orient and see what they want to see. Dr. Haugen warned that persons with a similar personality profile were prone to assume that things will work out fine, and so have a tendency not to take necessary actions. For that reason, such persons are vulnerable to a pattern of neglect. Such persons also tend to bottle up frustrations, which results in explosions of anger. He related that respondent might externalize blame in order to protect his self-esteem. The inability to understand self-defeating behaviors and acknowledge responsibility, Dr. Haugen stated, also makes it difficult for such persons to change behavior through counseling.

There was strong evidence in the record that—consistent with Dr. Haugen's diagnoses and opinions—respondent lacked insight into his own poor decisions, could not see how those decisions affected his children, and did not understand how his efforts to minimize or deflect criticism of his decisions made it likely that he would continue to make poor decisions. Indeed,

---

[2] We review de novo whether the trial court properly interpreted and applied the relevant statutes. See *In re Gonzales/Martinez*, 310 Mich App at 431. The trial court's factual findings underlying its application of the law are reviewed for clear error. *Id*. at 430; see also MCR 3.977(K). A finding is clearly erroneous when this Court is left with the definite and firm conviction that a mistake has been made. *In re Gonzales/Martinez*, 310 Mich App at 430-431.

the trial court found that that respondent's refusal to accept responsibility for his poor decisions placed the child at risk if returned to respondent's care.

The evidence established that respondent had seven children with five different women over the years. The record showed that his children had repeated involvement with CPS for more than 20 years. Respondent disavowed any responsibility for the involvement of CPS in his children's lives. The trial court, however, found that respondent's attempt to minimize his role in those events lacked credibility. It found that he was "right in the middle" of all the events involving CPS. The court explained, for example, that respondent actively participated in bouncing another child, DM, back and forth between respondent's household and the household of DM's mother. The court specifically found that respondent and DM's mother did so to frustrate CPS investigations.

The evidence from the CPS investigations supported those findings. The reports showed that the investigators on one occasion thought that DM was safe because he was with respondent only to learn later that respondent had allowed DM to return to his mother. There were also allegations in the CPS records that permitted an inference that respondent knew that DM's mother allowed DM to stay with inappropriate caregivers, including DM's older half-brother, RM, and that DM suffered abuse as a result.

The trial court also correctly noted that there were allegations of neglect and abuse that directly implicated respondent. There were allegations that, at one point in time, respondent was alleged to have been selling marijuana out of his home on behalf of his brother and that respondent allowed his older son to bring teenaged girls home for drugs and sex. There were further allegations that both respondent and his older son smoked marijuana in front of DM. The trial court wrote as well that respondent had been investigated for allegations that he engaged in sexual misconduct with DM and that he remained on the central registry after that investigation. The record supported each of those findings, notwithstanding that there was also evidence to support an inference that respondent did not engage in inappropriate sexual contact with DM.

Testimony and evidence showed that the two sons that respondent raised until they were 16 years of age, RM and MM, had both been involved in criminal sexual conduct. Moreover, RM had been imprisoned for second-degree murder, and MM had been imprisoned for first-degree criminal sexual conduct involving a child under the age of 13. MM had been in prison for about 15 years at the time of the hearing, which indicated that he committed his crime shortly after he left respondent's home. DM too had been having difficulties. The evidence showed that he had had behavior issues in school and had failing grades. As explained by Dr. James Henry, the outcomes for respondent's three older children were consistent with children who had suffered complex trauma or otherwise had insecure attachments.

The evidence supported a finding that, even if respondent did not directly abuse his children, he failed to protect them from the circumstances that led to harm, and he contributed to the lack of stability in their lives. The evidence showed that those shortcomings were not a thing of the distant past. There was evidence that respondent participated in the transfers of DM from home to home, despite the instability that that created for DM, and despite the repeated involvement of CPS. The trial court also found that DM had a history of having been sexually abused by relatives and strangers. Respondent did not accept that his own decisions caused harm

-5-

to DM, which made it more likely that he would repeat the mistakes that led to those harms. Respondent's treatment of DM and his other children was evidence that permitted an inference that he would neglect AB's needs in the same way and that AB would also suffer from an insecure attachment to his caregivers. See *In re Kellogg*, 331 Mich App 249, 259; 952 NW2d 544 (2020) (stating that how a parent treats one child is probative of how the parent will treat another child).

The trial court did not clearly err when it found that respondent was right in the middle of all the CPS investigations and that his involvement in the lives of his older children implicated his capacity to safely parent AB. The court's finding was mirrored by Dr. Haugen's assessment that persons like respondent were vulnerable to patterns of neglect because they simply expect that everything will turn out right without any effort on their part.

The trial court also considered the implications from respondent's relationship with AB's mother, EC. The trial court found that respondent's decision to have sexual relations with a teenage girl implicated his ability to make good decisions. The trial court repeatedly emphasized that it was obvious to anyone who cared to observe EC in person that EC—who was just 18 years of age at the time when respondent decided to have sex with her—was troubled, immature even for her age, and addicted to drugs. For that reason, the court rejected respondent's claim that he was unaware that EC had a drug problem. The court found it telling as well that respondent could only respond that EC was "legal" when confronted with the impropriety of his decision to have sex with her. The trial court could rightly expect that a then 50-year-old man, who claimed to have successfully raised several teenagers, would have better sense than to engage in sexual intercourse with a drug-addicted teenager who exhibited signs of being troubled. The fact that he did not see the problem with his action, when combined with the evidence that his older children had lived in unstable homes and were exposed to drug use and sexual impropriety, supported an inference that respondent did not have the capacity to make sound decisions regarding the care of children.

The same was true of the evidence involving the stabbing incident that caused AB to come into the Department's care. When respondent refused to return AB to the mother's care, a confrontation occurred that resulted in respondent being stabbed by the mother's stepfather. In his recitation of events, respondent painted himself as a hero who remained calm, reasonable, and polite throughout a violent altercation. When asked what role he played in the events, respondent answered that he worked to protect AB from his unstable mother and ended up fighting for his life as a result. The trial court did not agree that the events were so simple. The trial court indicated that it had interacted with all the parties involved, except EC's stepfather. It stated that each of them were "very vocal individuals," and it suggested that it was not surprised that there was a fight on that day. The court also found it worthy of note that the presence of a gun played a larger role in the facts recited in the police report. The evidence from the stabbing supported an inference that respondent was not the heroic victim that he portrayed in his testimony, but that his poor decisions during that event also played a role in the Department's intervention.

There was evidence that respondent could be aggressive and threatening with those persons who he thought were wronging him. The trial court found that he used intimidation to obtain what he wanted. The evidence and findings were consistent with Dr. Haugen's report that persons with respondent's personality traits tended to present well when left unchallenged, but become angry when confronted. It was also consistent with Dr. Haugen's assessment that respondent might have problems coping and might bottle up frustrations until he exploded. Respondent's inability to

admit his faults, when coupled with his poor coping skills and potential for explosive conduct, was evidence that he might pose a danger to a child left in his care.

Lisa Velez, a clinical social worker, and respondent's counselor, Marija Johnson, both testified in a way that supported an inference that respondent had made progress in treatment. If believed, the trial court might even have found that respondent had made sufficient progress in addressing his problematic personality traits to parent AB safely. The trial court did not, however, find their testimonies credible. The court instead focused on respondent's testimony in which he continued to blame the mothers of his children and the system itself for all his children's problems. His own testimony showed that he was not able to appreciate how his poor decisions had harmed his children, which undermined Johnson's claims that respondent had developed insight into his faults and could be expected to better protect and nurture AB if the Department were to return AB to respondent's care. On this record, the trial court did not clearly err when it found that respondent had not benefited from the counseling. And the evidence that respondent had not benefited from that service was evidence that he would again engage in similar patterns of neglect. See *In re Trejo*, 462 Mich 341, 346 n 3; 612 NW2d 407 (2000).

The trial court also stated that respondent had an unstable home life. It "jump[ed] off the page," the court wrote, that the Department simply accepted respondent's explanation for his finances. He lived in a home that someone else owned without paying rent. He was unemployed and relied on cash assistance from family and friends. He also owed more than $25,000 in child support. Although he claimed to be disabled by a heart condition and chronic pain, the trial court noted that respondent had been turned down for disability and had no problem chasing after a three-year-old on a playground. The court opined that evidence flew in the face of respondent's claim that he could not work. The evidence suggested that respondent's financial stability and homelife were far less secure than he presented, which also posed a potential for instability and harm.

Although reasonable people might disagree with the trial court's findings, the trial court carefully and thoughtfully examined all the evidence and found that the evidence established that respondent had not benefited from the services provided to him. Instead, the trial court found that respondent had not developed insight into his own shortcomings. His lack of accountability, the court stated, made it likely that he would neglect AB in the same ways that he neglected DM. This Court defers to the trial court's superior ability to judge the credibility of the witnesses and evidence. See *Martin v Martin*, 331 Mich App 224, 239; 952 NW2d 530 (2020). Consequently, on this record, the trial court did not clearly err when it found that the L-GAL established by clear and convincing evidence that, on the basis of respondent's conduct or capacity, there was a reasonable likelihood that AB would be harmed if returned to respondent's home, MCL 712A.19b(3)(j).

Once the trial court found that the L-GAL established a ground for terminating respondent's parental rights to AB, the trial court had to terminate respondent's parental rights if it also found that termination was in AB's best interests. See MCL 712A.19b(5). The focus is on the child at the best-interest stage of the proceedings—not the parent. See *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). When considering AB's best interests, the trial court had to weigh all the evidence and consider a variety of factors:

To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014).]

The trial court found that termination was in AB's best interests. In reaching that conclusion, the trial court focused on the testimony of Dr. Henry and AB's need for permanence and stability in his life.

Dr. Henry testified that AB showed signs of already having been the victim of moderate to significant trauma. He cited the evidence that AB did not cry when he first came into foster care. The evidence also showed that AB was severely underweight and had a flattened head. By respondent's own admission, respondent had been responsible for a significant amount of AB's care by the time he was removed from respondent's home. As such, there was evidence from which one could infer that respondent was responsible for some portion of AB's earliest trauma. There was also evidence that AB had been experiencing trauma as a result of the confusion created by being shuffled between his foster home and visits with respondent.

Dr. Henry explained that attachment was foundational to a child's development and served as a building block for reaching higher levels of functioning. Dr. Henry opined that AB's foster father had performed exceptionally well in all areas involving attachment and stated that AB had a very secure attachment that was reciprocal with his foster father. By contrast, although respondent had some positive parenting skills, he did not show as much nurturing and engagement with AB. Dr. Henry stated that he was concerned about respondent's ability to provide the underlying building block of relational connection that keeps a child safe and secure. He also stated that it was troubling that respondent had not been able to take ownership of his own faults.

Although Dr. Henry did not preclude the possibility that AB might be able to develop a proper attachment under respondent's care, he opined that it would be a more difficult road for AB than if he were to remain with his foster parents. But in either case, Dr. Henry stated, that time was of the essence. Permanency was of vital importance to AB, he related, and AB needed it as soon as possible. Despite the urgency of the need for permanency, Dr. Henry suggested that it would not be possible to place AB immediately with respondent. He explained that respondent lacked the baseline of connection that was necessary to give AB the safety that he needed psychologically.

The evidence supported the trial court's finding that respondent had not developed accountability for his acts even after months of counseling. Instead, he continued to deflect blame to others and minimize his role in the events that had harmed his children. Given the lack of progress, the limited attachment between him and AB, and AB's pressing need for permanency, the trial court did not clearly err when it found that termination of respondent's parental rights to AB was in AB's best interests.

The trial court did not err when it determined that the L-GAL had established a ground for termination and that termination was in AB's best interests.

Affirmed.

/s/ David H. Sawyer
/s/ Douglas B. Shapiro
/s/ James Robert Redford